UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JIRI K.,

Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

Defendant.

Case No. 20 C 7621

Magistrate Judge Sunil R. Harjani

### MEMORANDUM OPINION AND ORDER

Plaintiff Jiri K. seeks judicial review of the Acting Commissioner of Social Security's final decision that he is not entitled to disability insurance benefits ("DIB"). Jiri requests reversal of the ALJ's decision and remand, and the Commissioner seeks an order affirming the decision. For the following reasons, the Court affirms the ALJ's denial of benefits.

### BACKGROUND

On April 21, 2017, Jiri applied for DIB, alleging disability since August 5, 1992, his date of birth, due to a learning disability, a vision problem (nystagmus) and left side deficits.[1] Jiri was 24 years old at the time he filed his application, and his date last insured is December 31, 2022. Jiri was born premature in the Czech Republic at approximately 34 weeks gestation and experienced some loss of oxygen at birth. Jiri speaks Polish originally. He attended kindergarten in the Czech Republic before moving to Chicago, and he enrolled in the first grade in Chicago. In third grade and based on a case study evaluation, it was determined that Jiri was eligible for special

---

[1] Jiri states that although he has struggled with learning deficits and left-sided deficits since infancy, for purposes of his DIB application, he would accept a finding of disability as of October 1, 2016, when he was first insured for disability under Title II.

education services due to a learning disability that adversely impacted language-based areas. He received the services of a classroom aide and occupational therapy, physical therapy, speech/language therapy, and vision itinerant services. Based on a March 2002 neurological assessment, Jiri's eligibility for special education services was amended to include an orthopedic impairment and learning disability as secondary.

Jiri testified that he lives with his parents. He had an IEP (individualized education program) from fourth grade through high school. After graduating high school, he earned an associate's degree from Triton College in Business Management. Jiri works part-time as a "watchman" at the high school he attended, typically 8-16 hours a week on weekends and sometimes at holiday events. He testified that his high school gym teacher helped him get the job. Jiri has a driver's license, but he does not drive due to his vision problems. At a consultative psychological evaluation, Jiri denied depression, anxiety, or any other emotional issues and stated that he has not been prescribed any medication. (R. 447-48). At that exam, Jiri also reported that he has no attentional issues and is able to concentrate. *Id*. at 448.

The ALJ held a hearing on February 25, 2019 and a supplemental hearing on January 28, 2020. Jiri waived his right to counsel and appeared unrepresented at both hearings. (R. 172). On February 6, 2020, the administrative law judge ("ALJ") issued a decision denying Jiri's application. *Id*. at 43-55. The ALJ concluded Jiri last met the insured requirements on December 31, 2022 and had not engaged in substantial gainful activity since August 5, 1992, the alleged onset date. *Id*. at 45-46. The ALJ found Jiri's left sided weakness secondary to left hemiplegia, neurodevelopment disorder with learning disorder, and nystagmus were severe impairments but did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at 46-48. Specifically, with respect to Jiri's mental impairment, the ALJ

considered Listing 12.11 (neurodevelopmental disorders). *Id.* at 47-48. As part of his step-three analysis and in the four Paragraph B domains, the ALJ determined that Jiri's mental impairments caused a moderate limitation in understanding, remembering or applying information, no limitation in interacting with others, moderate limitation in concentrating, persisting, or maintaining pace, and no limitation in adapting or managing oneself. *Id.* The ALJ then determined that Jiri had the residual functional capacity ("RFC") to perform light work except that he can: never climb ladders, ropes, or scaffolds, or operate foot controls with the left lower extremity; no more than frequently balance, stoop, or kneel; no more than occasionally crouch or crawl; reach, handle, finger, and feel constantly with the upper right extremity; only occasionally reach, handle, finger, and feel with the upper left extremity; never be exposed to dangerous moving machinery and unprotected height; never perform commercial driving; and perform simple and routine tasks, in work performed at a flexible pace, involving only end of the day production requirements with no hourly or other periodic production quotas. *Id.* at 48-53. Based on the vocational expert's testimony at the second hearing, the ALJ found that Jiri is able to perform a significant number of jobs in the national economy, including parking attendant, host, and order caller. *Id.* at 53-54. As a result, the ALJ found Jiri was not disabled from August 5, 1992, the alleged onset date of disability, nor at any time between the date first insured of October 1, 2016, through the date of the decision. *Id.* at 54-55. The Appeals Council denied Jiri's request for review on October 23, 2020. *Id.* at 1-7.

## **DISCUSSION**

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform his former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence "means—and means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) ("Substantial evidence is not a high threshold."). In reviewing an ALJ's decision, the Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination." *Reynolds v. Kijakazi*, 25 F.4th 507, 510 (7th Cir. 2019). Nevertheless, where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

4

In support of his request for reversal and remand, Jiri raises three arguments, including that the ALJ: (1) erred at step three in failing to call a medical expert to testify regarding whether he equaled a listed mental impairment; (2) failed to account for his moderate difficulties with concentration, persistence, or pace; and (3) erred at step five in finding him capable of performing jobs that were available in significant number in the national economy. The Court finds that the ALJ did not commit reversible error and his decision is supported by substantial evidence, which is only "more than a mere scintilla" and such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Biestek*, 139 S.Ct. at 1154.

## A. Step Three Finding

At step three, the ALJ found that Jiri's learning disorder did not meet or medically equal the criteria of Listing 12.11. (R. 47-48). Jiri argues that the ALJ erred at step three when he did not call a medical expert to determine whether his learning disability medically equals any listed impairment and in failing to consider Listing 12.05B. The listings describe conditions "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). "Under a theory of presumptive disability, a claimant is eligible for benefits if [he] has an impairment that meets or equals an impairment found in the Listing of Impairments." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citing 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1). A claimant "has the burden of showing that his impairments meet a listing and he must show that his impairments satisfy all of the various criteria specified in the listing." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). However, the "ALJ should mention the specific listings he is considering and his failure to do so, if combined with a 'perfunctory analysis,' may require remand." *Id*.

Turning to the record evidence, at the initial level of review and on June 30, 2017, Gayle Williamson, Psy.D., reviewed the record, including a February 2008 psychological evaluation with intellectual testing and IQ scores from Jiri's high school psychologist. (R. 104-05, 343-46). With respect to the Paragraph B criteria, Dr. Williamson found that Jiri was moderately limited in his ability to understand, remember, or apply information, not limited in his ability to interact with others, moderately limited in his ability to concentrate, persist, or maintain pace, and not limited in his ability to adapt or manage himself. *Id*. at 105. In assessing Jiri's mental RFC, Dr. Williamson found that Jiri had certain moderate limitations relating to understanding and memory and sustained concentration and persistence. *Id*. at 107. Specifically, Dr. Williamson found only moderate limitations in Jiri's ability to understand, remember, and carry out detailed instructions. *Id*. In the narrative portion of the assessment, Dr. Williamson opined that Jiri retains the mental capacity to: understand, remember and concentrate sufficiently in order to carry out 1-2 step instructions/tasks and to sustain efforts for a normal work period; make simple work decisions; interact and communicate with others sufficiently in a work setting; and adapt to simple, routine changes and pressures in the work environment. *Id*. at 108. On October 24, 2017, Larry Kravitz, Psy.D., reviewed the evidence available at the reconsideration level and affirmed the Paragraph B assessment and mental RFC determination of Dr. Williamson. *Id*. at 115-16, 118.

On August 16, 2018, Laura Higdon, Ph.D., conducted a psychological evaluation and provided her opinion about Jiri's mental work capacity. (R. 440-53). Upon mental status examination, Jiri showed intact thought processes, no difficulties with immediate and delayed recall, good concentration and attention, and appropriate judgment and insight. *Id*. at 449-50. Dr. Higdon opined that Jiri is "somewhat limited, as far as his ability to follow written instructions, [] but is able to follow verbal instructions." *Id*. at 450. She noted that Jiri does manage his money,

but opined that he "might benefit from some supervision or reviewing his finances, because of visual deficits." *Id*. Finally, Dr. Higdon wrote that although Jiri "does show some mild deficits intellectually" and "tends to be concrete," he is "quite independent in most areas and is aware of his weaknesses." *Id*. She assessed Jiri as having a learning disability with reading. *Id*. Dr. Higdon additionally completed a "Medical Source Statement of Ability to do Work-Related Activities (Mental)" form, in which she opined that Jiri had a "mild" limitation in his ability to carry out complex instructions and a "moderate" impairment in carrying out written instructions secondary to his visual impairment. *Id*. at 451-53.[2] When asked to identify any other capabilities affected by the mental impairment, Dr. Higdon noted that Jiri's visual deficit impairs his reading ability. *Id*. at 4452. Dr. Higdon concluded that Jiri had no other mental limitations. *Id*. at 451-52.[3]

In addition to the three psychologists' opinions in the hearing-level record, Jiri argues that Social Security Ruling ("SSR") 17-2p required the ALJ to rely on a fourth medical expert when

---

[2]     The form provided the following definition of mild: "[t]here is a slight limitation in this area, but the individual can generally function well." (R. 451). The form defined "moderate" as "[t]here is more than a slight limitation in this area but the individual is still able to function satisfactorily." *Id*.

[3]     On February 26, 2020, 20 days after the ALJ issued his decision, Dr. Mark Amdur provided a psychiatric evaluation of Jiri at the request of Jiri's new attorney. (R. 18-21). Dr. Amdur concluded that Jiri had left-sided hemiparesis and a learning disability with cognitive impairments. *Id*. at 21. Dr. Amdur opined that: (1) Jiri's cognitive impairments, visuospatial problems, and left-sided hemiparesis convey limits on his work capacity; (2) his pace at work would be very slow; (3) a vocational assessment would show performance speed and performance quality that is beneath competitive standards; (4) Jiri's excessive intrusion to seek guidance and reassurance would further slow performance and degrade the quality of his interactions with supervisors; and (5) if awarded disability benefits, he would not be capable of managing funds independently because of intellectual or cognitive impairments. *Id*. Jiri submitted the assessment by Dr. Amdur to the Appeals Council. The Appeal's Council denied Jiri's request for review and found that the additional evidence from Dr. Amdur did not relate to the period at issue. *Id*. at 1-2. Because the ALJ did not have the opportunity to review Dr. Amdur's report, this evidence cannot be considered on judicial review and cannot serve as the basis for reversal pursuant to sentence four of 42 U.S.C. § 405(g). *Eads v. Sec'y of Health & Human Servs.*, 983 F.2d 815, 817-818 (7th Cir. 1993) ("courts may not reverse an administrative law judge's decision on the basis of evidence first submitted to the Appeals Council."). Moreover, Jiri has not requested a sentence-six remand, which allows a court to remand the case to the Commissioner "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).

evaluating medical equivalence at step three. This is incorrect as the ALJ has discretion in obtaining medical expert testimony at step three. SSR 17-2p "provides guidance on how adjudicators at the hearings and Appeals Council (AC) levels of [the] administrative process make findings about medical equivalence . . . ." SSR 17-2p, 2017 WL 3928306, at *2 (Mar. 27, 2017). SSR 17-2p states that "[t]o assist [the ALJ] in evaluating [whether an individual's impairment(s) meets or medically equals a listing], adjudicators at the hearings level *may* ask for and consider evidence from medical experts (ME) about the individual's impairment(s), such as the nature and severity of the impairment(s)." *Id*. at *3 (emphasis added). And if an ALJ determines that the evidence does not reasonably support a finding of medical equivalence, the ALJ can find that the claimant does not equal the listing without obtaining evidence from a medical expert. *Id*. at *4 ("If an adjudicator at the hearings . . . level believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, we do not require the adjudicator to obtain ME evidence . . . prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment."); *Lisa S. v. Saul*, 2020 WL 5297028, at *8 (N.D. Ill. Sept. 4, 2020). Thus, the ALJ was not required to obtain medical expert input prior to finding that Jiri did not medically equal listing 12.11 or any other listing.

Jiri similarly argues that the Appeals Council ("AC") erred in failing to follow SSR 17-2p and obtain a report from its medical staff regarding medical equivalence.[4] The AC denied Jiri's request for review, so the ALJ's decision is the final decision subject to judicial review. (R. 17);

---

[4]     Jiri states in one sentence in his brief's section on step three that the AC erroneously found that Dr. Amdur's report dated February 26, 2020 did not relate back to the period at issue, which was on or before February 6, 2020, the date the ALJ issued his decision. Doc. 18 at 11-12. To the extent that Jiri is intending to argue that the AC failed to properly consider Dr. Amdur's report, he fails to develop it. Accordingly, the Court considers any issue concerning the AC's determination that Dr. Amdur's report did not relate to the period on or before the date of the hearing decision waived. *Krell v. Saul*, 931 F.3d 582, 586 n.1 (7th Cir. 2019) (brief and underdeveloped arguments are waived).

*Wilder v. Kijakazi*, 25 F.th 644, 650 (7th Cir. 2022). And contrary to Jiri's assertion, SSR 17-2p does not establish that the AC was required to seek a report from its medical staff regarding medial equivalence or erred by denying Jiri's request for review without one. Rather, it states that "when the AC exercises its authority to issue a decision, it determines whether an individual's impairment(s) meets or medically equals a listing" and "*may* ask its medical support staff to help decide whether an individual's impairment(s) medically equals a listing." SSR 17-2p, 2017 WL 3928306, at *3 (emphasis added). Thus, the ruling only requires the AC to consider medical equivalency if it issues a decision. Because the AC denied Jiri's request for review, the AC did not, and was not required to, consider the issue of medical equivalence. Moreover, even if the AC had granted Jiri's request for review, its decision on whether to seek input from its medical support staff on the issue of medical equivalence is discretionary. *Id*. Like the ALJ, the AC is not required to obtain medical staff input if it concludes that a claimant's impairments do not medically equal a listing. *Id*. at *4 ("If an adjudicator at . . . the AC level believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, we do not require the adjudicator to obtain . . . medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment."). Accordingly, the Court concludes that the AC did not commit legal error by declining to obtain a report from its medical staff regarding medical equivalence.

As part of his argument related to step three, Jiri also asserts that the ALJ was precluded from relying on the opinions of the state agency psychologists because they erroneously considered whether disability existed on or before December 31, 2016, rendering their opinions invalid and requiring the ALJ to obtain medical expert input. However, Jiri cites no authority to support this argument. Doc. 18 at 11. Nor does he address the Acting Commissioner's explanation that when

the state agency psychologists reviewed the record in 2017, Jiri's earning records through the end of 2016 established that his date last insured through that point was December 31, 2016. Doc. 26 at 6. The Acting Commissioner further explains that Jiri's date last insured changed at the hearing level because he continued to earn quarters of coverage through his work activity over the subsequent three years. *Id*. Moreover, SSR 17-2p clearly states that ALJs "must consider" the opinions of psychological consultants at the initial and reconsideration levels when issuing decisions. SSR 17-2p, 2017 WL 3928306, at *3. Nowhere does SSR 17-2p state that the assessments from psychological consultants at the initial and reconsideration levels are no longer valid when the claimant continues to earn income that extends his eligibility for DIB.

Jiri next contends that the ALJ erred by failing to address whether he met or equaled Listing 12.05B which addresses intellectual disorders. In her response brief, the Acting Commissioner states that Jiri's cognitive impairment is a neurodevelopmental disorder, and neurodevelopmental disorders are evaluated under Listing 12.11. The Acting Commissioner also cites Listing 12.00B(4)(c) which expressly states that neurodevelopmental disorders are not evaluated under Listing 12.05. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00B(4)(c) ("This category does not include the mental disorders that we evaluate under . . . neurodevelopmental disorders (12.11)."). Jiri does not challenge the ALJ's finding that he is suffering from a neurodevelopmental disorder and even in his reply brief, does not address Listing 12.00B(4)(c). (R. 46, 51). Thus, the ALJ correctly considered the applicability of Listing 12.11. Moreover, the section 2 criteria required to satisfy Listing 12.05B are the same Paragraph B criteria the ALJ analyzed under Listing 12.11. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.05B(2) and 12.11B. At step three, the ALJ explained how he reached his conclusion that Jiri had only moderate limitations in two functional areas, and Jiri does not challenge any aspect of the ALJ's analysis of the four areas of mental functioning.

The ALJ's discussion in this regard adequately demonstrates that Jiri would not met Listing 12.05B. Accordingly, Jiri has not demonstrated the applicability of Listing 12.05 to this case or that he meets all of the criteria of that Listing.

Further, the ALJ's determination that Jiri's learning disorder did not meet or equal Listing 12.11 is support by substantial evidence. Drs. Williamson and Kravitz concluded that Jiri's condition did not meet or medically equal Listing 12.11. (R. 105-06, 110, 115-17, 121). In particular, they found that Jiri had only moderate limitations in two of the Paragraph B domains. (R. 105, 115-16). The ALJ found these opinions to be of some persuasive value, and he found moderate limitations in the same two Paragraph B criteria noted by Drs. Williamson and Kravitz. *Id*. at 47-48, 52; 20 C.F.R. § 404.1526(c) (in determining if an impairment medically equals a listing, ALJs "consider the opinion given by one or more medical or psychological consultants designated by the Commissioner."); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (ALJ may properly rely upon the opinions of state agency medical experts). Drs. Williamson's and Kravitz's findings support a conclusion that Jiri did not meet or equal listing 12.11, which requires extreme limitation of one, or marked limitation of two, of the four mental functioning areas. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.11B. Significantly, Jiri points to no contradictory opinion. *Filus v. Astrue*, 694 F.3d 863, 867 (7th Cir. 2012) ("Because no other physician contradicted these two opinions [that he did not meet or medically equal any listed impairment], the ALJ did not err in accepting them."). Moreover, the ALJ considered the recent evidence of Dr. Higdon's opinion when making his step three decision. (R. 47-48).

Jiri's final argument with respect to step three is that the ALJ erred by relying on Drs. Williamson's, Kravitz's, and Higdon's opinions because the consultants did not consider Jiri's verbal IQ score of 62. The fact that the psychological reviewing and examining consultants did

not expressly cite Jiri's verbal IQ score of 62 does not mean they did not consider it, especially where they indicated that they had reviewed the school records which contained the verbal IQ score. (R. 104-05, 114-15, 344, 440). Additionally, the ALJ explicitly considered Jiri's verbal IQ score of 62. *Id*. at 51.

For all of these reasons, Jiri fails to satisfy his burden of showing that his mental impairment met or equal a listed impairment. As a result, Jiri's request for reversal and remand is denied as to the step three issues.

**B.      Mental RFC Assessment**

Jiri next contends that the ALJ's assessed mental RFC is not based on substantial evidence. The RFC is the "most physical and mental work the claimant can do on a sustained basis despite [his] limitations." *Madrell v. Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022). In addition, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996); *Jeske v. Saul*, 955 F.3d 583, 593 (7th Cir. 2020).

The ALJ's mental RFC limited Jiri to simple and routine tasks and work performed at a "flexible pace," meaning that it "involve[ed] end of the day production requirements with no hourly or other periodic quotas." (R. 48). The ALJ explained that more restrictive mental limitations with respect to concentration, persistence and pace were not warranted by the record because Jiri (1) can independently perform daily activities, including using public transportation, handling his own finances, playing video games, going shopping, doing household chores, using the computer to search for jobs and checking email, and reading, and (2) he demonstrated intact thought processes, no difficulties with immediate and delayed recall, good attention and

concentration, and fair insight and judgment at the consultative psychological evaluation. (R. 48, 51). In assessing Jiri's mental RFC, the ALJ found the opinions of the state agency reviewing psychologists to be of some persuasive value and the opinion of Dr. Higdon to be persuasive. *Id*. at 52-53. The ALJ also observed that at the hearings, Jiri was able to answer questions posed to him in a coherent and appropriate manner and there was no evidence of apparent difficulties focusing and following the content of either hearing. *Id*. at 48.

Jiri challenges the ALJ's mental RFC determination on two grounds. First, he argues that the ALJ failed to adequately accommodate his need to work at a slower pace than others and to be allowed extra time to complete tasks. Second, he argues the ALJ should have included an off-task time restriction in the RFC to accommodate his difficulties remaining on task. Doc. 18 at 12-13. Specifically, Jiri maintains that he would need to be off-task more than 15% of the workday, and the vocational expert testified that off-task time of more than 15% of the workday would be work preclusive. (R. 98).

More than a scintilla of evidence supports the ALJ's decision not to include slower pace and off-task time limitations in the mental RFC. In the record before the ALJ, the only opinions regarding Jiri's mental functional capacity came from the state agency reviewing psychologists and Dr. Higdon's consultative psychological evaluation. These three psychological opinions did not include a slower pace limitation or off-task time limitation. The state agency reviewing psychologists Drs. Williamson and Kravitz found that Jiri's understanding and memory and concentration and persistence problems only impacted his ability to understand, remember, and carry out detailed instructions. (R. 107, 118). They opined that Jiri had moderate limitations relating to understanding, remembering, and carrying out detailed instructions. *Id*. However, both state agency reviewing psychologists found no significant limitations in any other area, including

13

in Jiri's ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without a reasonable number and length of rest periods. *Id.* In terms of specific work restrictions, Drs. Williamson and Kravitz found, among other things, that Jiri had the ability to "sustain efforts for a normal work period." *Id.* at 108, 119. In determining the mental RFC, the ALJ found the state agency psychologists' opinions to be of "some persuasive value" as they were consistent with the evidence as a whole. *Id.* at 52. Nevertheless, the ALJ determined that the overall record and the hearing testimony supported even further limitations, including the requirement that Jiri should be limited to work at a flexible pace, involving end of the day production requirements with no hourly or other periodic production quotas. *Id.* With respect to Jiri's abilities to concentrate for extended periods, perform activities within a schedule, and perform at a consistent pace, "[t]his finding was more limiting than that of any state agency [] psychologist, illustrating reasoned consideration given to the evidence [Jiri] presented." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Moreover, Jiri does not contest the ALJ's analysis of these opinions, and state agency psychological consultants are "highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a(b)(1); *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022) (same).

Likewise, the psychological consultative examiner, Dr. Higdon, did not include any limitations for work at a slower pace or off-task time in her findings. (R. 451-52). As the ALJ noted, during the consultative psychological evaluation, Jiri showed some mild deficits intellectually but had intact thought processes, no difficulties with immediate and delayed recall, good attention and concentration, and appropriate insight and judgment. *Id.* at 48, 51, 449-50.

Specifically, Dr. Higdon determined the Jiri had a mild limitation carrying out complex instructions based on his moderate impairment following written instructions and a visual deficit impairing his reading ability, but no limitations in understanding, remembering, and carrying out simple instructions, the ability to make judgments on simple and complex work-related decisions, the ability to understand and remember complex instructions, and the ability to follow verbal instructions. *Id*. at 451-52. The ALJ considered Dr. Higdon's opinion persuasive because it was supported by a thorough examination and consistent with the other evidence of record including Jiri's ability to independently tend to his activities of daily living, a finding Jiri does not challenge. *Id*. at 52-53.

The ALJ's mental RFC finding incorporated the limitation to simple and routine work tasks found by the state agency reviewing psychologists and consultative examining psychologist and imposed even further limitations, including the requirement that Jiri should be limited to work at a flexible pace, defined as only end of the day production requirements with no hourly or other periodic production requirements. The ALJ's mental RFC finding was based on these three psychologists' opinions that Jiri's particular CPP difficulties arise only when he has to understand, remember, or carry out detailed instructions or carry out complex written instructions. (R. 107-08, 118-19, 451). The ALJ reasonably relied on the opinions of the state agency psychologists and consultative examining psychologist. *Burmester*, 920 F.3d at 511 ("[A]n ALJ may reasonably rely upon the opinion of a medical expert who translates [checkbox] findings into an RFC determination."); *see also Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021) (holding that a "moderate limitation in performing at a consistent pace" in the state agency consultants' checkbox rating was consistent with the narrative opinions that the claimant had "the ability to perform simple, repetitive tasks at a consistent pace."). Notably, the record before the ALJ contained no

opinion from any mental health professional which would indicate the need for any limitations specific to slower pace or off-task time. *See Gedatus v. Saul*, 994 F.3d 893, 904 (7th Cir. 2021) ("A fundamental problem is [that plaintiff] offered no opinion from any doctor to set sitting limits, or any other limits, greater than those the ALJ set."); *Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) ("When no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error."). Because no psychologist opined that Jiri had specific restrictions for a slower work pace or off-task time, substantial evidence supports the ALJ's mental RFC determination. *Lockett v. Saul*, 834 F. App'x 236, 239 (7th Cir. 2020).

Jiri argues that Dr. Higdon's opinion cannot be relied on as substantial evidence to justify the benefit denial because she ignored or disregarded: (1) Jiri's school records showing that "even when given additional time to complete tasks and allowed to work at a slower pace, he still struggled" and (2) his verbal IQ score of 62. Doc. 27 at 3. However, the record indicates that these documents were reviewed by Dr. Higdon when she prepared her assessment and considered by the ALJ. (R. 51). As part of her psychological evaluation, Dr. Higdon reviewed Jiri's IEP, which states that Jiri often times needs assistance with extended time and a slower pace, and the results from the Wechsler Abbreviated Scale of Intelligence (WASI) test, which included his verbal IQ score of 62. *Id*. at 336, 344, 440. Thus, Jiri is not entitled to remand based on this evidence.[5]

Jiri identifies no unaddressed evidence that supports a restriction related to a slower pace or off-task time, but in support of his argument cites to his sister's report that he has difficulty completing tasks and easily loses concentration and that the fact that even in a special education

---

[5]    In his reply brief, Jiri claims that had he been represented at the hearing, "the unreliability of Dr. Higdon's report would have been brought to the ALJ's attention." Doc. 27 at 3. But Jiri does not contend that the ALJ did not obtain a valid wavier of counsel from him. Nor does Jiri identify any errors or inconsistencies in Dr. Higdon's opinion that make it unreliable, other than the school records and verbal IQ score cited by Jiri which were not ignored by Dr. Higdon, as discussed above.

environment in high school, he needed extended time to complete tasks and a slower pace. Doc. 18 at 12.  The ALJ reviewed Jiri's high school records and discussed Jiri's testimony and his sister's statements. (R. 47-48, 51).  The ALJ found Jiri's sister's statements persuasive and the level of impairment she described as consistent with the record but found the evidence as a whole demonstrated that Jiri was not precluded from working entirely. *Id*. at 53.  Jiri does not disagree with the ALJ's evaluation of the third-party statement by Jiri's sister.  Finally, the ALJ partially discounted Jiri's subjective statements based on Dr. Higdon's opinion and the fact that Jiri independently performed a wide range of daily activities. *Id*. at 47-48 49, 52-53.  Jiri does not identify any error in the ALJ's evaluation of Jiri's testimony about his symptoms and limitations, and the ALJ was not required to adopt limitations he found were inconsistent with the evidence. *Outlaw v. Astrue*, 412 F. App'x 894, 898 (7th Cir. 2011) ("The ALJ need[] only include limitations in his RFC determination were supported by the medical evidence and that the ALJ found to be credible.").

In short, it was Jiri's burden to establish that his learning disorder would cause him to work at a slower pace or to be off task, and he has not met that burden here. *Gedatus*, 994 F.3d at 905 (claimant "bears the burden to prove she is disabled by producing medical evidence."); *Weaver v. Berryhill*, 746 F. App'x 574, 578-79 (7th Cir. 2018) ("having been diagnosed with these impairments does not mean they imposed particular restrictions on [claimant's] ability to work . . . It was [claimant's] burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work.").  No mental health professional opined that a slower pace/extended time restriction or any time off-task limitation was warranted.  And ultimately, the ALJ assessed a mental RFC pace restriction that was more favorable to Jiri, including restricting him to work allowing for flexible pace with only end of day

production requirements and no hourly or other periodic production quotas, and including a limitation to simple and routine tasks, which was consistent with the opinions of Drs. Williamson, Kravitz, and Higdon. *Jonathan Daniel G. v. Saul*, 2022 WL 972407, at *2 (N.D. Ill. March 31, 2022) (rejecting plaintiff's challenge to the RFC because he did not explain how the RFC limiting him to simple, routine, repetitive tasks in a work environment free of fast-paced production requirements failed to accommodate his "documented need for extended time to complete assignments and finish tests" on an IEP; *Cf. Crump v. Saul*, 932 F.3d 567, 569, (7th Cir. 2019 (ALJ failed to adequately account for moderate CPP limitations where state agency consultants scored claimant's ability to maintain attention and concentration for extended periods as moderately limited and ALJ did not account for VE's opinion that a claimant who needed to be off-task 20% of the time was not employable, which was based largely on the improperly disregarded opinion of claimant's treating psychiatrist); *DeCamp v. Berryhill*, 916 F.3d 671, 675-76 (7th Cir. 2019) (ALJ erred in limiting claimant to "unskilled work" with no "fast-paced production line or tandem tasks" where ALJ cited in part to support her finding a state agency psychologist's opinion who found claimant moderately limited in the areas of maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; and completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace); *Varga v. Colvin*, 794 F.3d 809, 814-15 (7th Cir. 2015) (ALJ's reference to "flexible pace" was insufficient to account for claimant's moderate difficulties in the areas of maintaining attention and concentration for extended periods and completing a normal workweek without interruption from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods).

**C.**     **Step Five Determination**

Finally, Jiri challenges the ALJ's step five finding. "At this final step, the agency bears the burden of showing that suitable jobs exist in significant numbers." *Chavez v. Berryhill*, 895 F.3d 962, 963 (7th Cir. 2018). In testifying as to what jobs are available and in what numbers in the national economy, VEs often refer to job categories as listed in the Dictionary of Occupational Titles ("DOT"). *Bruno v. Saul*, 817 F. App'x 238, 243 (7th Cir. 2020). If a plaintiff does not identify any conflicts between the DOT and the VE's testimony at the hearing, he has to show on appeal that the conflicts were "obvious enough that the ALJ should have picked up on them without any assistance." *Surprise v. Saul*, 968 F.3d 658, 662 (7th Cir. 2020).

Here, the VE identified 140,000 jobs nationally in three positions that a hypothetical individual of Jiri's background and RFC could perform. (R. 97-98). Specifically, the VE testified that such a hypothetical person could perform the jobs of parking attendant (50,000 jobs nationally), host (60,000 jobs nationally), and order caller (30,000 jobs nationally). *Id*. According to the VE, these positions are classified as unskilled, light work. *Id*. The ALJ specifically asked the VE whether her testimony was consistent with the DOT and companion publications, and the VE testified that it was, except for the fact that the DOT does not differentiate with regards to the side for handling and fingering and whether it is bilateral or unilateral and the DOT does not address breaks, time off task, on task time, and absenteeism. *Id*. at 98. The VE explained that her responses to questions related to those issues were based on her professional experience and training. *Id*. at 98-99. Relying on the VE's testimony, the ALJ concluded that Jiri remained capable of performing a significant number of jobs in the national economy, specifically parking attendant; host; and order caller. *Id*. at 53-54.

Jiri claims that substantial evidence does not support the ALJ's finding that he could perform the parking-lot attendant job given the ALJ's conclusion that he can never perform commercial driving. (R. 50, 97). Given Jiri's *pro se* status at the hearing, the ALJ was obligated "to ask questions that will elicit a full picture of the applicant's capacity for full-time gainful employment." *Johnson v. Barnhart*, 449 F.3d 804, 807 (7th Cir. 2006). Appearing unrepresented at the hearing, Jiri did not identify any conflict between a "no commercial driving" restriction and the DOT's description of the parking-lot attendant job, which includes a driving component among the parking-lot attendant's tasks.[6] Jiri reported that he does not drive due to his vision impairment (nystagmus), and the ALJ found Drs. Paul Nasilowski's and Scott Smith's opinions that Jiri is not able to operate a motor vehicle due to nystagmus persuasive. Since the ALJ limited Jiri to never performing commercial driving, it should have been obvious to the ALJ that there was a possible and unresolved conflict between the VE's testimony that a person with a no commercial driving restriction can perform the parking-lot attendant job and the DOT's description of that job, which includes a driving component. (R. 52, 93-94, 260, 331, 471, 441).

---

[6]     The DOT describes the job of parking lot attendant as follows:

Parks automobiles for customers in parking lot or storage garage: Places numbered tag on windshield of automobile to be parked and hands customer similar tag to be used later in locating parked automobile. Records time and drives automobile to parking space, or points out parking space for customer's use. Patrols area to prevent thefts from parked automobiles. Collects parking fee from customer, based on charges for time automobile is parked. Takes numbered tag from customer, locates automobile, and surrenders it to customer, or directs customer to parked automobile. May service automobiles with gasoline, oil, and water. When parking automobiles in storage garage, may be designated Storage–Garage Attendant (automotive ser.). May direct customers to parking spaces.

DOT § 915.473–010.

On the current record, the ALJ's reliance on the parking-lot attendant job, which includes a driving component, is problematic.  "Conflicting interpretations of 'commercial driving' could exist[,]" and the ALJ did not define this term for the VE. *Johnson v. Commissioner of Social Security*, 2019 WL 2270951, at *3, 6 (N.D. Ohio May 29, 2019) (VE testified that "commercial driving" is not defined in the social security regulations and a limitation to avoid "commercial driving" was ambiguous).  "Commercial driving" could be defined as "not perform[ing] any driving that required special licensure, such as a CDL or an endorsement to drive passenger vehicles." *Id*.  Or, it could mean that Jiri could not do any driving for work purposes. *Id*. at *3. Because the ALJ did not specifically state what he meant when his RFC and hypothetical question presented to the VE precluded "commercial driving," the Court is unable to determine whether Jiri's limitations precluded him from performing the parking-lot attendant job which includes a driving component in the DOT description. *Id*. at *6.

The Acting Commissioner interprets the "no commercial driving" restriction in the RFC and hypothetical question as requiring a job with no driving duties and insists that driving is not required for every job within the "Parking-Lot Attendant" occupation. Doc. 26 at 12.  For example, the Acting Commissioner argues that some jobs might involve driving an automobile to a parking space, but other jobs might simply involve "point[ing] out [a] parking space for customer's use" (for example, in a self-park facility). *Id*.  The Acting Commissioner cites *Mitchell v. Kijakazi*, 2021 WL 3086194, at *2 (7th Cir. 2021), for the proposition that the DOT "lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings."  While that is true, the Commissioner's citation is incomplete.  The remainder of the cited sentence states that "an ALJ may rely on an expert's testimony that provides 'more specific information' about a job than the *Dictionary* based on the expert's experience." *Id*.

But that did not happen in this case. It is conceivable that someone precluded from driving in the course of the job could perform the job of parking-lot attendant, but the VE did not testify that a non-driver could do the job. And it is not clear whether the VE excluded from the number of jobs provided those positions which would require performance of driving duties. *Caire v. Colvin*, 2013 WL 4039070, at *3 (C.D. Cal. Aug. 7 ,2013) ("It is possible that the VE intended to restrict the hypothetical claimant to work in a booth [to accommodate claimant's stand/walk limitations with use of a cane, but] [t]he court cannot tell from the record whether the VE adjusted the number of jobs to account for such a subset of parking lot attendant jobs."). Thus, it is not possible for the Court to determine what portion of the number of jobs the VE testified existed reflected jobs not requiring the performance of driving duties. *Staples v. Astrue*, 2009 WL 232496, at *3 n.3 (D. Me. Jan. 29, 2019), *report and recommendation adopted*, 2009 WL 418601 (D. Me. Feb. 19, 2009). Without clarification about the meaning of the no "commercial driving" restriction and the driving requirement for the jobs provided by the VE, the VE's testimony was unreliable in this regard and the ALJ erred in relying on the parking-lot attendant job to meet the agency's step five burden of showing that there was work existing in significant numbers in the national economy that Jiri could perform.

Jiri asserts that the two remaining jobs cited by the VE, host and order caller, require a "fair amount of reading on the job," which is incompatible with his nystagmus and reading deficits. Doc. 18 at 13. Jiri's argument here is essentially a challenge to the ALJ's RFC assessment which did not include any reading restriction. For the reasons already provided, the ALJ properly relied on the opinions of Drs. Williamson, Kravtiz, and Higdon in assessing Jiri's mental work restrictions. Neither reviewing psychologist found that Jiri required any additional restriction for reading, and Dr. Higdon considered Jiri's reading deficits but opined that Jiri would be able to

function satisfactorily with respect to his ability to follow written instructions. (R. 107-08, 118-19, 448, 450-52). Moreover, the physical RFC, which Jiri does not challenge, did not include a reading restriction. The Court therefore finds no error in the ALJ's finding that Jiri could perform the host and order caller jobs.

Putting aside the position of parking-lot attendant, the ALJ still found that Jiri could perform 90,000 jobs in the national economy (60,000 host jobs and 30,000 order caller jobs). Jiri argues that 90,000 national jobs is not a significant number of jobs for purposes of the ALJ's step five determination. The Court disagrees. The Seventh Circuit has found that 30,000 jobs in the national economy in two occupations is "enough jobs" and that 140,000 national jobs is "well above the threshold for significance." *Mitchell*, 2021 WL 3086194, at *1, 3; *Weatherbee v. Astrue*, 649 F.3d 565, 572 (7th Cir. 2011); *see also Primm v. Saul*, 789 F. App'x 539, 546 (7th Cir. 2019) (110,000 jobs nationally is a significant number); *Collins v. Berryhill*, 743 F. App'x 21, 25 (7th Cir. 2018) (55,000 jobs is a significant number of jobs in the national economy). Case law from this district also establishes that 90,000 jobs in the national economy constitutes a significant number of jobs. *Thai N. v. Kijakazi*, 2022 WL 2340877, at *10 (N.D. Ill. June 29, 2022) (27,000 jobs nationally is a significant number); *Norman B. v. Kijakazi*, 2022 WL 444198, at *8 (N.D. Ill. Feb. 14, 2022) (52,200 jobs nationally is a significant number); *Joseph M. v. Saul*, 2019 WL 6918281, at *17 (40,000 jobs nationally is a significant number); *Dorothy B. v. Berryhill*, 2019 WL 2325998, at *7 (N.D. Ill. May 31, 2019) (17,700 jobs nationally is a significant number); *Iversen v. Berryhill*, 2017 WL 1848478, at *5 (30,000 jobs nationally in one position is a significant number). Thus, more than a scintilla of evidence supports the ALJ's determination that significant work exists in the national economy that Jiri can perform and any error regarding the

ALJ's failure to define the no "commercial driving" restriction and address the driving requirements for parking-lot attendants was harmless. *Mitchell*, 2021 WL 3086194, at *3.

## <u>CONCLUSION</u>

For the reason stated above, Jiri's request to reverse and remand the ALJ's decision is denied and the Commissioner's request for affirmance is granted. Pursuant to sentence of four of 42 U.S.C. § 405(g), the ALJ's decision is affirmed.

**SO ORDERED.**

Dated: July 12, 2022

_____
Sunil R. Harjani
United States Magistrate Judge